SUCESIÓN DEL TORO, DEMANDANTE Y APELANTE, *v.* ZAMBRANA, DEMANDADO Y APELADO.

APELACIÓN procedente de la Corte de Distrito de Mayagüez en pleito sobre restitución de finca y daños y perjuicios.

No. 1826.—Resuelto en mayo 31, 1919.

PRUEBAS—VERACIDAD DE LOS TESTIGOS SOBRE CIERTOS PARTICULARES—INSPECCIÓN OCULAR.—Cuando la corte inferior da crédito a los testigos de una parte con respecto a ciertos particulares de sus declaraciones, comete error al negárselo con respecto a otros particulares en que sus declaraciones están contestes y no fueron impugnadas por la prueba de la parte contraria; sin que para apoyar esa resolución de la corte inferior en apelación, pueda alegarse que la misma fué el resultado de una inspección ocular practicada por la corte, cuando del récord no aparece que esa inspección fuera practicada.

HONORARIOS DE ABOGADO—DIFERENCIA ENTRE LO PEDIDO Y LO CONCEDIDO—TEMERIDAD—DISCRECIÓN.—No abusa de su discreción la corte inferior al no condenar al demandado al pago de honorarios de abogado, cuando hay diferencia entre lo pedido en la demanda y lo concedido en la sentencia, por la que se concede menos que lo pedido, pues en ese caso no puede haber temeridad por parte del demandado al defenderse.

Los hechos están expresados en la opinión.

Abogado del apelante: *Sr. Ricardo del Toro Soler.*

Abogados del- apelado:· *Sres. José Sabater y Juan Valdejully.*

El Juez Presidente Sr. Hernández, emitió la opinión del tribunal.

Con fecha 3 de mayo de 1917 la Sucesión de Juan Miguel del Toro y Torres, representanda por las personas que se designan en la demanda, promovió juicio ante la Corte de Distrito de Mayagüez contra Alberto Zambrana e Irizarry para obtener la restitución de cierta finca rústica con indemnización de perjuicios, alegando para fundamentar su acción ser dueños, por herencia de su padre Juan Miguel del Toro y Torres, fallecido en 25 de enero de 1917, de una finca salinera o salina llamada "Caborrojeña" en el barrio de Boquerón, municipio de Cabo Rojo, de la que forma parte una porción de cuerda y media de terreno colindante por el sur y por el oeste con terrenos del demandado Alberto Zambrana e Irizarry, y que estando su causante en posesión de esa parcela de terreno, el demandado en 6 de junio de 1916 maliciosa y fraudulentamente se la apropió destruyendo la cerca que la separaba de sus terrenos y poniendo otra cerca para separar como separó de la finca salinera la expresada cuerda y media de terreno, desde cuya fecha venía cultivándola y utilizando sus productos. Alegan además los demandantes que por consecuencia del despojo verificado por el demandado se ven privados de la posesión material de la cuerda y media de terreno, desde cuya fecha venían cultivándola y utilizando sus productos. Alegan, además los demandantes, que por consecuencia del despojo verificado por el demandado se ven privados de la posesión material de la cuerda y media de terreno, habiendo sufrido los perjuicios siguientes:

(*a*) Valor de los frutos dejados de sembrar, $40.

(*b*) Daños sufridos en los cristalizadores y salitrales de la salina, consistentes en haberse ensuciado una gran parte de ellos con las aguas corrientes de las lluvias, por conse-

cuencia de haber quitado Zambrana las mayas de cerca de la finca, $300.

(*c*) Sal dejada de sacar en esos cristalizadores ensuciados como consecuencia de los hechos expuestos bajo la letra (*b*), $960.

(*d*) Valor de las cercas destruídas por el demandado, $100.

(*e*) Valor de los árboles cortados y destruídos por el demandado, $5.

Esas partidas hacen un total de $1,315.

La demanda concluye con la súplica de que el demandado sea condenado a restituirles la parcela de cuerda y media de terreno de que han sido despojados, a indemnizarles todos los frutos que están obligados a restituir los poseedores de mala fe o su importe, y a pagarles la cantidad de $1,315 como indemnización de daños y perjuicios, así como los honorarios de abogado y las costas y gastos del litigio.

El demandado además de negar en su contestación las alegaciones de la demanda, adujo materia nueva y formuló contrademanda para obtener indemnización de perjuicios que había sufrido por valor de $261.

Celebrado el juicio la corte dictó sentencia en 17 de enero de 1918 por la que declara con lugar la demanda y ordena que el demandado Alberto Zambrana e Irizarry restituya a la sucesión demandante en la porción de cuerda y media de terreno, parte integrante de la salina denominada "Caborrojeña," ordenando, además, que los demandantes obtengan y recobren del demandado la suma de $15, con costas, gastos y desembolsos a cargo de dicho demandado.

Contra la anterior sentencia interpusieron los demandantes recurso de apelación para ante esta Corte Suprema en cuanto sólo les otorga el derecho de recobrar del demandado la suma de $15 y no les concede los honorarios de abogado.

Fundan los apelantes su recurso en dos motivos, a saber: *Primero.* Que la corte inferior erró al no dar a las pruebas

de los demandantes el valor que tienen por sí y por no haber sido contradichas, invocando al efecto los artículos 4, 16 y 162 de la Ley de Evidencia en sus párrafos 6º. y 7º. *Segundo.* Que la corte inferior erró al no conceder a los demandantes los daños punitivos o ejemplares y los honorarios de abogado que determina la ley, sosteniendo, además, que con arreglo al artículo 281 del Código de Enjuiciamiento Civil tienen derecho a obtener una sentencia por el total del importe de los daños causados.

Examinemos la prueba aportada al juicio por los demandantes en apoyo de la indemnización pretendida en su demanda.

Esa prueba consistió en las declaraciones de los testigos Juan del Carmen Montero, Lorenzo Montero, y Guillermo del Toro, que en la parte pertinente transcribimos a continuación.

### TESTIGO JUAN DEL CARMEN MONTERO.

"* * * Ahora está en posesión del terreno don Alberto Zambrana, quien quitó la cerca que tenían los Sres. Toro, porque eso y que era de él, puso unos alambres por donde había las mayas a la orilla del camino, * * * eso ocurrió del seis al siete de junio de 1916, desde entonces Zambrana ha cultivado esa porción de terreno, la sembró de maíz que le produjo cuarenta y cinco quintales * * * que como consecuencia de haber quitado Alberto Zambrana la cerca y haberse apropiado ese terreno, los dueños de las Salinas sufrieron daños y perjuicios, porque la cerca era muy tupida, y al ser quitada y venir la lluvia, las aguas entraron a los cristalizadores y los dañaron; eran aguas con fango, aguas sucias que venían con fuerza desde la parte alta de la costa; cuando estaba la maya, las aguas se regaban y venían lentamente, pero quitada la maya, como no había qué la detuviera, el chorro de agua se introdujo en los cristalizadores, cuando estaba la maya no pasaba eso, porque la maya era una defensa. Hubo que limpiar los cristalizadores, que botarles el agua, porque no se pueden limpiar con agua, luego dejarlos un tiempo para que el fango se seque, para entonces limpiarlos con palas; emplearon en ese trabajo setenta días, y como después no pudieron dar ningún resultado, vinieron a estar en condiciones de producir sal, como a los seis meses; * * * trabajaron seis peones, entre ellos el declarante, ganando ochenta centavos cada uno, durante 70 días.

Que en esos tres meses es costumbre sacar la sal, lo que depende del tiempo; que en ese tiempo había seca; sólo cayó un chubasco, pero pronto despejó. En concreto, de no haber pasado lo que pasó, y con el tiempo que hubo, se pudo haber sacado de seis a siete mil fanegas de sal en los cinco cristalizadores, de la parte del frente, que fueron dañados. Que el declarante ha estado y está ahora encargado de la venta de sal y en esa época el año pasado, vendieron la sal al precio de quince y a veinte y cinco centavos el quintal; el quintal tiene de gastos nueve centavos y la fanega tiene tres quintales. Las cercas destruídas por Zambrana tenían un valor de veinte reales cuerda y eran de una longitud de cuatro cuerdas; en la fracción de terreno había árboles. los que tumbó Zambrana y los hizo leña, produciéndole tres toneladas; la tonelada de leña en esa época valía tres pesos, teniendo un peso de gastos; en la misma porción de terreno que se apropió Zambrana pudo haberse obtenido sembrando maíz, un producto de 45 quintales, los que valían en esa época a $3.80 el quintal, con un gasto cada uno de 15 centavos entre escogida y desgrane, pudiendo calcularse en totalidad un gasto en la cuerda y media como de $10, incluyendo arado y siembra.''

### TESTIGO LORENZO MONTERO.

''* * * Esa porción de terreno tiene una extensión de cuerda y media. * * * Puede valer como $60. * * * Ahora este año pasado fué que ocurrió que el Sr. Zambrana compró la porción de veinte cuerdas de terreno y quiso hacerse dueño de esa otra porción quitando los deslindes o colindancias que tenían los Sres. del Toro al frente; las quitó y cercó poniendo alambre a la otra maya que no le pertenecía. * * * Quitó la colindancia que cercaba a ellos y dejó unida la porción de terreno a las veinte cuerdas. * *. * Don Miguel del Toro quitó la cerca que puso Zambrana; éste la mandó a poner al día siguiente y desde entonces está esa cuerda y media en posesión de don Alberto Zambrana. Que como consecuencia de esos actos de Zambrana, los dueños de las salinas sufrieron perjuicios pues por haberse quitado la maya esa que se tenía allí, como represa de las aguas que bajaban; y vino una gran lluvia, desembocó la corriente, rompió los malecones y se entró dentro de las salinas el lodo y todas las aguas que había, causando un gran daño * * *; antes de quitar las mayas, las aguas no se metían porque las mayas las detenían y en lugar de venir directas pasaban con cautela; los cristalizadores se dañaron por el fango que bajó, traído por el agua, y era imposible hacer sal con ese fango; entonces para reparar el daño empezaron por desaguar los cristalizadores y estuvieron desa-

guándolos como veinte o veinte y cinco días porque hubo que esperar que el fango se secara; entonces metieron seis peones que estuvieron trabajando unos setenta días y los pagaban a 80 centavos diarios * * *. Desde que ocurrió esa inundación y la rotura de la cerca por Zambrana hasta que estuvieron los cristalizadores en condiciones de sacarse sal transcurrieron tres meses; en esos tres meses no habiendo ocurrido lo que ocurrió, esos cristalizadores hubieran estado en condiciones de sacar sal, siendo costumbre que produzcan esos cristalizadores en los meses de julio, agosto y septiembre de seis a siete mil fanegas de sal; esos tres meses son propios para la sosecha de sal. * * * En la cuerda y media de terreno se acostumbra a sembrar maíz; las cercas destruídas por Zambrana eran cuatro cuerdas de maya y valen a veinte reales cuerda; con respecto a árboles, Zambrana destruyó los que allí había, los hizo leña y carbón, que sacó de 8 a 9 toneladas de leña, valiendo la tonelada limpia a dos ᵗ ᵗ * * * Recuerda que Zambrana quitó la maya del 6 al 7 del mes de junio, cuyo aguacero grande de que hablaba fué del 16 al 18 de julio; ya antes había llovido pero el aguacero más grande fué en esa fecha. La inundación fué un mes y días después de haberse quitado la maya, pero ya había llovido y el agua entrado en los cristalizadores; entonces se empezó a bañarlos, no con un aguacero pequeño, que fué bastante regular. Después del 7 de junio cayó uno y en el mes de julio cayó el otro; con respecto al aguacero grande no puedo precisar cuándo fué, más o menos fué del 16 al 18 de julio, el grandísimo, el que hizo la inundación * * *. Cuando se quitó esa maya, para evitar que viniera la inundación, para evitar la corriente estaban preparando el alza del malecón del frente, pero no dió lugar a alzarlo por completo; estuvieron trabajando más o menos entre los cristalizadores y el malecón unos setenta días; antes de entrar el agua estuvieron trabajando de 15 a 16 días; no puedo precisarlo con seguridad, no pudieron terminar el trabajo, porque la lluvia no dejó * * *. Que la porción que ocupa Zambrana tiene cuerda y media y es por allí por donde viene una avenida más fuerte * * * habiendo sido la causa de que se metieran las aguas el haber Zambrana quitado las mayas, porque la avenida era fuerte y las mayas detenían las aguas.''

### TESTIGO GUILLERMO DEL TORO.

''Es administrador y condueño de las salinas. * * * Que el día 6 de junio del año pasado, o sea el 1916, Alberto Zambrana por sí y ante sí quemó las colindancias que tenían ellos (los demandantes) o sea juntó esa porción de terreno con las veinte cuer-

das de él, y cercó la parte abajo del camino incluyendo en su finca
ese pedazo de terreno; que ellos tenían una maya, y él puso una
maya más pequeña y alambre. * * * Que la destruyeron y se
la echaron abajo porque el pedazo de terreno era de ellos; después
Zambrana volvió a poner la cerca. * * * Que como consecuencia
de haber quitado Zambrana la maya de arriba que colinda con él,
como allí hace una hondonada el terreno, las aguas vienen con más
precipitación y se desparraman por encima del malecón, a los cinco
cristalizadores que quedan al frente, * * * los ensuciaron y no
se pudo fabricar sal con ellos en ese estado; para poder tener las
salinas en condiciones de producir sal le costó a los pocos días desa-
guar los cristalizadores, esperar que se secara el fango y proceder a
la limpieza, en la que gastó $336, tardando en ponerlos otra vez en
condiciones de hacer sal más o menos setenta días de trabajo; que
acostumbra a sacar en años anteriores en esos tres meses, en los 5
cristalizadores, 7,000 fanegas, las que le daban un promedio de 50
centavos fanega; que una fanega tiene tres quintales y veinte libras,
que la fanega tiene de gasto 9 centavos, o sea 1 centavo en la elabo-
ración, 5 de saca y 3 de embarque; que la cerca destruída por Zam-
brana valía $10 más o menos; que Zambrana tumbó los árboles, hizo
leña, más o menos cuatro toneladas, y la vendió, valiendo la tone-
lada en esa época $3 y cada tonelada tenía $1 de gasto. * * * Que
todos los años los cristalizadores cuajan sal en tiempo de seca, según
sea la seca, con un promedio cada cristalizador de dos cuajes por
mes desde mayo en adelante hasta septiembre en que empiezan las
lluvias; en esa época es que hacen los cuajes pues aunque caen sus
chubascos y aguaceros duros también, impiden poco tiempo el sacar
sal; que esos 5 cristalizadores pueden contener alrededor de 7,000
fanegas de sal en los dos cuajes que dejaron de sacar; si llueve y
está cuajado un cristalizador y es duro el aguacero se deshace la sal,
entonces se deja más tiempo para que se evapore y cuando se eva-
poran las aguas dulces, si continúa la seca vuelve a cuajar, pero si
no continúa la seca no cuaja; si el cristalizador está cuajado ya
para sacar y el agua no es muy fuerte, se le baja la compuerta y se
puede sacar la sal, pero si es duro se deshace y entonces se pierde
quince o veinte días o un mes para volver a cuajar; que a los pocos
días de haber quitado Zambrana la cerca llovió fuerte y del 16 al
18 de julio cayeron ligeros aguaceros; que lo que han dicho los dos
testigos anteriores respecto a que a mediados del mes de julio cayó
un fuerte aguacero, ha sido equivocación de ellos, siendo el aguacero
ese que cayó el que causó que se ensuciaran los cristalizadores; que
un aguacero que cae encima de los cristalizadores estando cuajados

suspende el cuaje, pero un aguacero como el que cayó que ensució los cristalizadores fué lo que determinó que no pudieran sacar sal durante tres meses.    Si cae agua del cielo evita el cuaje pero por poco tiempo.    Que acostumbra a pagar a los peones allí por sacar sal cinco centavos por fanega, por la limpieza de los cristalizadores pagan ochenta o noventa centavos diarios.''

### PRUEBA DEL DEMANDADO.

#### TESTIGO ALBERTO ZAMBRANA.

''Reside en Boquerón, de Cabo Rojo, en donde tiene una finca como de 180 cuerdas, conoce las salinas Caborrojeñas de los Sres. Toro las que colindan con dos fincas del declarante, una de ellas de 20 cuerdas de extensión.    *    *    *    Está en posesión de esa finca desde el día 3 de febrero en que la compró; al llegar a la finca había allí unos mogotes de maya en el medio de la finca, les pegó fuego, los arrancó y los botó de allí, había unas cuantas malezas, limpió todo eso poniéndolo en condiciones; que el 7 de julio de 1916 vino don Miguel del Toro acompañado por su hijo, un policía y varios peones; que el testigo no estaba allí sino su encargado que lo fué a buscar y cuando él llegó ya ellos no estaban allí y encontró las empalizadas en el suelo, todos los estacones quitados y las mayas arrancadas, esos estacones habían sido puestos por él, que él repuso en seguida la empalizada, porque no podía dejar la finca exenta, porque había ganado, que puso esa empalizada al lado de los salitrales.    *    *    *    Recuerda que cuando se destruyó la cerca por don Miguel del Toro, en junio del año pasado, allí no llovía, los meses de junio son meses secos y allí viene a llover del 15 de agosto en adelante; ese año en los meses de julio no llovió, algún chubasco; allí llueve del 15 de agosto en adelante.''

Han declarado otros testigos por parte del demandado pero sus declaraciones se encaminan principalmente a sostener el derecho de propiedad de Zambrana sobre la parcela de terreno de cuerda y media de que se trata y no a desvirtuar la prueba testifical del demandante.

De la declaración del testigo Juan del Carmen Montero se desprende que la cuerda y media de terreno produjo al demandado Zambrana 45 quintales de maíz que a razón de $3.80 el quintal, después de deducir un gasto de 15 centavos por quintal y $10 por gastos de arado y siembra, dan un

producto líquido de $154.25; que el trabajo de 6 peones en 70 días para poner las salinas en condiciones de producir sal, con jornal de 80 centavos cada uno, produjo el desembolso de $336; que 6,000 fanegas de sal que se dejaron de sacar en los cinco cristalizadores, equivalentes a 18,000 quintales con un producto en venta de 6 centavos quintal, dan un total de $1,080; que las cuatro cuerdas de cerca destruídas, a razón de $2.50 la cuerda, representaban la suma de $10; y que 3 toneladas de leña que le produjeron al demandado los árboles que echó a tierra, a $3 la tonelada, después de deducido $1 de gastos por tonelada daban un total líquido de $6. Todas las partidas expresadas ascienden a la suma de $1,586.25.

Según el testigo Lorenzo Montero, 6 peones que estuvieron trabajando unos 70 días en las salinas, con jornal de 80 centavos diarios, costaron $336; las cuatro cuerdas de maya destruídas por el demandado a razón de $2.50 la cuerda, representaban $10, y 8 toneladas de leña que utilizó Zambrana de los árboles destruídos, siendo $2 el producto líquido de cada tonelada, dan el valor de $16. Por más que ese testigo afirma que en la cuerda y media de terreno podía sembrarse maíz y que si los cristalizadores hubieran estado en condiciones de sacar sal en los meses de julio, agosto y septiembre hubieran producido de 6,000 a 7,000 fanegas, no explica el valor de dichas fanegas.

Según el testigo Guillermo del Toro, el trabajo para poner las salinas en condiciones de producir sal costó $336; las 7,000 fanegas de sal que dejaron de sacarse, teniendo cada fanega 9 centavos de gastos, importando cada fanega con esa deducción 41 centavos, dan la suma de $2,870; 4 toneladas de leña que sacó Zambrana de los árboles cortados, a $3 la tonelada, pero deduciendo $1 por gastos, representan $8; y el valor de la cerca destruída era de $10. Esas partidas dan el total de $3,224.

Al ordenar la corte sentenciadora que los demandantes

recobren del demandado la suma de $15, indudablemente se funda en el valor que dieron los testigos del demandante a las cercas destruídas por el demandado y a los árboles que cortó, que son las partidas d y c de la demanda.

En cuanto a la indemnización reclamada por el demandante por los daños sufridos en las cristalizadoras de las salinas (partida b) no vemos motivo para que la corte inferior no creyera la declaración de los testigos en tal extremo en que resultaron contestes y sin impugnación, toda vez que les dió crédito en otros particulares como fueron en el de la apropiación del terreno por el demandado, en el de la destrucción de las cercas y árboles y en el de la valoración de estos daños, y, por tanto, entendemos que los testigos Juan del Carmen, Lorenzo Montero y Guillermo del Toro dijeron la verdad al declarar que los daños causados en las cristalizadoras de las salinas por los actos del demandado ascendieron a $336, por lo que el demandante tiene derecho a recobrar los $300 que por tal concepto reclamó en su demanda. Esa partida está suficientemente justificada y la corte inferior incurrió en manifiesto error al denegar su pago.

No ocurre lo mismo con respecto a la indemnización reclamada en la partida letra c por las 6,000 fanegas de sal que según esos testigos dejaron de sacarse de las cristalizadoras durante el término de tres meses, pues bien pudo la corte no creer en la realidad de su existencia en vista de la gran discrepancia de los testigos sobre el valor de esa sal, toda vez que mientras Juan del Carmen Montero lo valora en $1,080, Guillermo del Toro hace ascender su importe a casi el triple, o sean $2,870, sin que el otro testigo declarara respecto de ese particular. En igual caso se halla la reclamación de la letra a pues los testigos Lorenzo Montero y Guillermo del Toro no declararon respecto de ella, haciéndolo solamente Juan del Carmen Montero quien la

valoró en $154.25 cuando la demanda alegaba importar solamente $40.

El apelado en su alegato escrito llama la atención de esta Corte Suprema acerca de que la corte inferior practicó una inspección ocular del terreno y de las salinas de los demandantes en unión de los abogados de ambas partes y sostiene que como consecuencia de dicha inspección la corte llegó a la conclusión de que no podía ser cierto que de los terrenos ocupados por el demandado debido a un aguacero se precipitara un caudal de agua dañando los salitrales de las salinas del demandante, por ser físicamente imposible, y que como consecuencia de ello tampoco fué cierto que tuvieran que emplear sesenta días en limpiar los cristalizadores ni que estuvieran éstos como seis meses sin producir sal, ni que existieran los daños sobre que declaraban los testigos empleados de las mismas salinas, entendiendo, por tanto, que sería una injusticia condenar al demandado a pagar una fuerte indemnización por daños que no existieron.

Ni del escrito de exposición del caso ni de ninguna otra parte del récord aparece que tal inspección ocular fuera practicada, y, por tanto, no puede invocarse para contradecir la prueba testifical ministrada por la parte demandante.

Nos abstenemos de dar consideración a la cuestión legal levantada por la parte apelante sobre falta de aplicación del artículo 281 del Código de Enjuiciamiento Civil, pues la demanda no fué presentada bajo la teoría que envuelve dicho artículo, como lo revelan los hechos y súplica de la misma, y no cabe alterar en grado de apelación los términos del debate judicial.

Por lo que toca a los honorarios de abogado no vemos que la corte inferior abusara de su discreción al no condenar al pago de ellos al demandado si tenemos en cuenta la diferencia que hay entre lo pedido en la demanda y lo concedido en la sentencia. *Martínez* v. *Padilla,* 19 D. P. R. 582.

Por las razones expuestas es de confirmarse la sentencia

apelada, pero modificándola en el sentido de que el demandado debe pagar a la parte demandante, y se le condena a pagarle la suma de trescientos dollars, además de los quince dollars a cuyo pago viene condenado.

> *Confirmada la sentencia apelada, modificada en el sentido de que se condena al demandado a pagar al demandante la suma de $300 además de los $15 a cuyo pago viene condenado.*

Jueces concurrentes: Sres. Asociados Aldrey y Hutchison. Juez disidente: Sr. Wolf.

El Juez Asociado Sr. Toro no intervino en la resolución de este caso.

OPINIÓN DISIDENTE DEL JUEZ ASOCIADO SEÑOR WOLF.

Disiento por el fundamento de que no existe base alguna para ir contra la conclusión general hecha por la corte inferior de que no existen daños y perjuicios excepto los específicos declarados probados. La corte inferior evidentemente no creyó a los testigos en cuanto a los demás daños generales lo mismo que este tribunal, según parece, no creyó que los daños fueron tan extensos como alegaron algunos de los testigos. No encuentro en los autos razón alguna para esta distinción.